**William L. ISAAC # a81624, Plaintiff,**

v.

**Earl T. JONES, William Sheldon, David Bunch, Frank Moran, James Rabideau, and Richard DeRobertis, Defendants.**

No. 81 C 2143.

United States District Court, N. D. Illinois, E. D.

Dec. 3, 1981.

---

William L. Isaac, pro se.

James Carroll, Asst. Atty. Gen., Chicago, Ill., for defendants.

## MEMORANDUM OPINION AND ORDER

ASPEN, District Judge:

Plaintiff William L. Isaac, an inmate at the Stateville Correctional Center ("Stateville") in Joliet, Illinois, brings this *pro se* civil rights action against Richard DeRobertis, Warden at Stateville, and five correctional officers seeking declaratory, injunctive, and monetary relief for the alleged violation of his constitutional rights. Before the Court are the motions of certain defendants to dismiss the complaint for failure to state a claim upon which relief may be granted and to strike plaintiff's sur reply brief.[1]

This suit arises out of an incident that occurred on February 3, 1981, in the Cellhouse B–West Segregation Unit at Stateville. The relevant allegations of the complaint are as follows. At approximately 9:00 a. m., defendant David Bunch released plaintiff from his cell so that he could attend the morning session of the prison law library. Bunch, who from prior encounters was on inimical terms with plaintiff, had released all the other inmates scheduled to attend the law library before coming to plaintiff's cell. Upset with the delay in his release, plaintiff exchanged words with Bunch and proceeded downstairs to the bullpen area where he complained about Bunch's conduct to defendant James Rabideau. When another verbal dispute broke out between plaintiff and Bunch, defendant Earl T. Jones, a correctional lieutenant, ordered Rabideau to remove plaintiff's name from the library list.

After all the inmates had left the bullpen for the library, Jones ordered plaintiff to return to his cell. Instead of complying with the order, plaintiff requested to speak to defendant Frank Moran, apparently Jones' superior. Jones then grabbed plaintiff, who was handcuffed behind his back, and started shoving him toward the stairs. When plaintiff fell, Jones, Bunch, and defendant William Sheldon picked him up and began to carry him up the stairs. Halfway up the first flight of stairs the guards dropped plaintiff causing him to slide back down the stairs on his back bumping his head on the steps. As plaintiff neared the bottom of the stairs, Jones stepped on plaintiff's face and then proceeded to stand on his neck. Plaintiff saw Moran observing these events from the doorway of his office.

When the guards attempted to carry plaintiff up the stairs for a second time, he began to resist. Jones then ordered Sheldon and Bunch to place plaintiff in a "steel-enclosed" control segregation cell. Before walking to the cell on his own accord, plaintiff requested permission to gather certain items of personal property that had fallen from his pockets during the altercation. Jones and Rabideau refused the request. Subsequent informal attempts to regain possession of the property were unsuccessful.

Plaintiff remained in the control segregation cell for three days. The cell contained neither lights, workable toilet, sheets on the

---

1. Plaintiff has not obtained proper service over defendant William Sheldon. Sheldon thus does not join in the motions now pending before the Court.

cotton mattress, blankets, articles of personal hygiene, nor heat, and was located directly across from an open, broken window. After his third day in control segregation, plaintiff was given a hearing on a Resident Disciplinary Report charging him with disobeying a direct order and being disrespectful to an employee. The hearing was continued, and the charges against plaintiff apparently were dismissed at a later date.

Shortly after his placement in control segregation, plaintiff asked for an examination by a medical technician. He was experiencing pain about his head, back, and wrists as a result of the struggle with the guards. Despite repeated verbal and written requests for medical care, plaintiff was not given any assistance for a period of six days. On February 9, 1981, a doctor gave plaintiff a cursory examination and prescribed a pain killer. According to pleadings filed by plaintiff subsequent to the complaint, he continues to experience pain and receive medical attention for injuries suffered during the encounter upon which the complaint is based.

Applying the liberal standards mandated by Haines v. Kerner, 404 U.S. 519, 92 S.Ct. 594, 30 L.Ed.2d 652 (1972), the Court construes the allegations of the complaint to assert six claims of constitutional violations: (1) the recision of plaintiff's library privileges on February 3, 1981, deprived him of his right of access to the courts; (2) the guards' use of force against plaintiff constituted cruel and unusual punishment; (3) the denial of prompt medical attention for his injuries violated plaintiff's rights under the eighth amendment; (4) the taking of plaintiff's property was without due process; (5) the placement of plaintiff in control segregation was arbitrary and in derogation of administrative regulations; and (6) the conditions of confinement in control segregation amounted to an infliction of cruel and unusual punishment in violation of the eighth amendment.

■ Before addressing the merits of plaintiff's claims, the Court finds it useful to set forth the standards to be applied in appraising the sufficiency of the complaint. A motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure can be granted only if it appears "beyond doubt that plaintiff can prove no set of facts in support of his claim which would entitle him to relief." Conley v. Gibson, 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–102, 2 L.Ed.2d 80 (1957). In making this assessment, all allegations are assumed to be true. Estelle v. Gamble, 429 U.S. 97, 99, 97 S.Ct. 285, 288, 50 L.Ed.2d 251 (1976). Moreover, because plaintiff is proceeding without benefit of counsel, the adequacy of the allegations are adjudged by standards less stringent than those applied to formal pleadings drafted by lawyers. Hughes v. Rowe, 449 U.S. 5, 9, 101 S.Ct. 173, 176, 66 L.Ed.2d 163 (1980). With these principles in mind, the Court turns to a substantive review of the allegations to determine if they are sufficient to state a claim for relief under 42 U.S.C. § 1983.

## I. Denial of Access to the Courts

Plaintiff asserts that defendants violated his constitutional right of access to the courts when they denied him library privileges on his regularly-scheduled day. Defendants contend that the denial of access to a law library on one occasion does not offend the constitutional guarantee of access to the courts. Defendants further argue that the cancellation of plaintiff's law library privileges was justified by his misconduct and that plaintiff fails to allege any resultant harm from the cancellation. In his responsive brief, plaintiff concedes that he is challenging only a temporary restriction on his law library access, but claims that the restriction caused him to miss a deadline for filing a responsive brief in United States ex rel. Issac v. Franzen, 80 C 5088 (N.D.Ill. filed Oct. 1, 1980).

■ The constitution does not guarantee a prisoner absolute access to a prison law library. See Bounds v. Smith, 430 U.S. 817, 830, 97 S.Ct. 1491, 1499, 52 L.Ed.2d 72 (1977). Prison officials are free to reasonably regulate the time, place, and manner in which library facilities are used so long

as inmates are assured meaningful access to the courts. *Knell v. Bensinger*, 489 F.2d 1014, 1017 (7th Cir. 1973). Meaningful access is the touchstone. *Bounds, supra*, 430 U.S. at 823, 97 S.Ct. at 1495. A finding that prison officials have deprived an inmate of meaningful access to the courts cannot be sustained in the absence of some showing of prejudice. *See Bach v. Coughlin*, 508 F.2d 303, 308 (7th Cir. 1974).

Plaintiff's claim that defendants' revocation of his library privileges adversely affected an action he had pending in this Court is not supported by this Court's records.[2] Plaintiff filed his responsive brief in case 80 C 5088 on February 13, 1981. The Court has yet to rule on the motion. Since plaintiff was able to submit his brief in ample time to permit its consideration, the Court can find no merit to plaintiff's claim that defendants deprived him of his constitutional right of access to the courts.

## II.   *Guard Abuse*

Plaintiff alleges that defendants Sheldon, Jones, and Bunch physically abused him in the presence of defendant Moran. Defendants contend that the alleged force used against plaintiff was not so severe as to cross the line separating a simple battery from a constitutional tort cognizable under § 1983.

The use of force by prison guards against an inmate is not subject to scrutiny under the eighth amendment unless it is tantamount to an intentional infliction of excessive or grossly severe punishment. *See Stringer v. Rowe*, 616 F.2d 993, 998 (7th Cir. 1980). In determining whether a particular infliction of force upon an inmate is sufficiently severe to constitute cruel and unusual punishment, a court must consider such factors as the amount of force used, whether the use of force was reasonable and justified by the circumstances, and the extent of injury inflicted. *Johnson v. Glick*, 481 F.2d 1028, 1033 (2d Cir.), *cert. denied*, 414 U.S. 1033, 94 S.Ct. 462, 38 L.Ed.2d 32 (1973).

When viewed in light of these factors, the complaint's allegations of guard abuse, liberally construed and accepted as true, are sufficient to withstand a motion to dismiss. The Court is not persuaded by defendants' argument that plaintiff alleged insufficient injury to give rise to a claim of constitutional magnitude. To the contrary, plaintiff asserts that the unprovoked scuffle with the guards caused him severe pain and has resulted in lasting injuries that have required continuing medical attention. Moreover, when, as alleged here, the use of force is unreasonable and not related to any perceived need to maintain order or prison discipline, the lack of extensive injury is not dispositive of the claim. *See Howell v. Cataldi*, 464 F.2d 272, 280–81 (3d Cir. 1972). Thus, without expressing any opinion as to the ultimate resolution of this issue, the Court concludes that it is not beyond doubt that plaintiff can prove no set of facts in support of his claim that defendants subjected him to an intentional infliction of excessive force in violation of the eighth amendment's proscription against cruel and unusual punishment.

## III.   *Deprivation of Medical Care*

Plaintiff alleges that, despite numerous written and verbal requests, he was denied medical attention for a period of six days following the February 3 incident. Defendants challenge plaintiff's claim of denial of prompt medical care on grounds that the complaint fails to disclose any relationship between defendants and the provision of medical care to plaintiff, that exhibits attached to plaintiff's pleadings show that he has received extensive medical attention from doctors and medical technicians, and that plaintiff has failed to produce any medical records to substantiate his allegations of serious medical needs.

To state a claim for relief under 42 U.S.C. § 1983 for denial of medical treatment, a prisoner must allege deliberate

---

**2.** When interests of justice require, a court may take judicial notice of its own records in ruling on a motion to dismiss. *Kamsler v. MFI Corp.*, 359 F.2d 752, 753 (7th Cir. 1966).

indifference to serious medical needs. *Estelle v. Gamble, supra,* 429 U.S. at 104, 97 S.Ct. at 291. An intentional denial or delay of access to medical care by prison guards is one manner in which the required deliberate indifference may be manifested. *Id.* at 104–05, 97 S.Ct. at 291. Contrary to defendants' assertion, the complaint explicitly alleges that plaintiff verbally requested defendants Jones, Sheldon, and Rabideau to assist him in obtaining necessary medical attention and transmitted several written notes to Rabideau requesting to see a medical technician. The failure of these defendants to promptly respond to plaintiff's requests provides sufficient personal involvement to state a claim for relief against them under the deliberate indifference standard enunciated in *Estelle.* As noted in the prior discussion of plaintiff's claim of abusive use of force by the guards, the allegations of injury are of sufficient magnitude to give rise to at least an inference of serious medical needs. Because this action comes before the Court on a motion to dismiss, plaintiff need not at this time submit evidence to prove his allegations of serious injury.

■ That plaintiff has received extensive medical care after February 9, 1981, is irrelevant to his claim against the guards. The gravamen of the complaint relates to the delay in obtaining medical treatment. Thus, the complaint focuses on the period between the time of plaintiff's injury on February 3, 1981, and his first opportunity to be examined by medical personnel on February 9, 1981. A lack of evidence that the injury was aggravated by the failure to receive prompt medical attention does not necessarily foreclose an award of damages for pain experienced during the delay. *Robinson v. Moreland,* 655 F.2d 887, 890 (8th Cir. 1981). Accordingly, the motion to dismiss is denied as to this claim.

## IV. *Deprivation of Property*

■ Plaintiff alleges that he was unlawfully deprived of certain items of personal property. Defendants assert that the claim fails for lack of a showing of any personal involvement between the named defendants and the loss of plaintiff's property and, without reference to any particular case or statute, that plaintiff has an adequate remedy in state court for his missing property.

Defendants have misrepresented the allegations of the complaint with regard to the issue of personal involvement. Plaintiff specifically avers that defendants Rabideau and Jones refused him permission to gather the property that had fallen from his trousers immediately following the confrontation. He further alleges that after he was put in control segregation, defendant Sheldon refused a request to retrieve the property that plaintiff had lost. Finally, the complaint states that defendants Jones and Rabideau responded to inquiries sent through an intermediary by denying any knowledge of the whereabouts of plaintiff's property. These allegations clearly suffice to show defendants' involvement in the alleged taking of plaintiff's property. *See Kimbrough v. O'Neil,* 545 F.2d 1059, 1061 (7th Cir. 1976) (*en banc*).

Defendants do not explain how the existence of an adequate state court remedy affects plaintiff's claim of intentional deprivation of property. The Court assumes that defendants rely upon the recent Supreme Court decision in *Parratt v. Taylor,* 451 U.S. 527, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981) to support their proposition. In *Parratt,* the Court held that an adequate post-deprivation remedy provided by the state is all the process that is constitutionally due to remedy a loss of personal property occasioned by the negligence of state agents. *Id.,* 101 S.Ct. at 1917. In *Kimbrough, supra,* however, the Seventh Circuit held that the existence of an adequate remedy in Illinois courts was immaterial to a prisoner's claim that state officials either intentionally or with reckless disregard deprived him of personal property. *Id.* at 1061. The Court in *Taylor* did not reach the issue of what process was due to remedy an intentional, as opposed to negligent, taking of property. *See id.* at 1918 (J. Blackmun, concurring). Whether *Parratt* requires a reexamination of the holding in

*Kimbrough* is a difficult and important legal question that the Court declines to address, *sua sponte*, without briefs from the parties.

### V. *Control Segregation*

█ Defendants wholly fail to respond to two claims asserted by plaintiff. The first claim pertains to plaintiff's allegations concerning the dire conditions of the control segregation cell in which he was housed for three days. The Seventh Circuit has previously found allegations of conditions similar to those alleged by plaintiff sufficiently harsh to state a claim for relief under the eighth amendment. *See Chavis v. Rowe,* 643 F.2d 1281, 1291–92 (7th Cir. 1981), *cert. denied,* —— U.S. ——, 102 S.Ct. 415, 70 L.Ed.2d 225 (1981). The brevity of the period during which plaintiff was compelled to endure these conditions does not render his claim inactionable. *See Kimbrough v. O'Neil,* 523 F.2d 1057, 1059 (7th Cir. 1975).

Plaintiff also alleges that he was placed in a "steel-enclosed" control cell for no apparent reason. Confinement in control segregation is governed by Illinois Department of Corrections Administrative Regulation 804(II)(L) ("A.R. 804").[3] A.R. 804 defines control segregation as "the short-term confinement of residents presently assigned to the Segregation Unit, in a security environment designed for the control of residents where extreme violence, bizarre or self-destructive behavior is manifested." A.R. 804 further requires that disciplinary procedures be instituted in all control segregation placements. Thus, it appears that placement in the more onerous conditions of control segregation is a disciplinary measure that normally is authorized only under the limited circumstances defined in A.R. 804. Plaintiff alleges that his summary removal to a control segregation cell was arbitrary and unjustified because he was not exhibiting any of the extreme forms of behavior required for such placement under A.R. 804.

---

**3.** The text of A.R. 804(II)(L) is attached as an appendix to this decision. A.R. 804 has been revised since the dates relevant to this action. Illinois Department of Corrections Administra-

█ Inmates have no liberty interest in remaining in a particular prison or particular portion of a prison unless state law or administrative regulation conditions transfer on the occurrence of specified events. *Meachum v. Fano,* 427 U.S. 215, 228, 96 S.Ct. 2532, 2540, 49 L.Ed.2d 451 (1976). Here, A.R. 804 ostensibly provides the predicate necessary for triggering due process by limiting the circumstances in which an inmate may be transferred from disciplinary segregation to the apparently more oppressive conditions of confinement in control segregation. *See Vitek v. Jones,* 445 U.S. 480, 488, 100 S.Ct. 1254, 1261, 63 L.Ed.2d 552 (1980); *Bono v. Saxbe,* 620 F.2d 609, 616 n.8 (7th Cir. 1980). Defendants give no reason as to why A.R. 804 does not give rise to a protectible entitlement interest. Assuming that it does, as the Court reads the complaint to allege, then plaintiff's claim that he was summarily and unjustifiably placed in control segregation is actionable under 42 U.S.C. § 1983 as a due process violation. *See Hughes v. Rowe, supra,* 449 U.S. at 11, 101 S.Ct. at 177.

### VI. *Moran and DeRobertis*

Defendants Moran and DeRobertis seek to be dismissed from the action on the grounds that the complaint fails to allege any specific facts showing their personal involvement in the acts of misconduct upon which plaintiff bases his claims for relief. Defendants assert that they cannot be held liable under § 1983 as supervisory officials in the absence of allegations of personal involvement.

█ Plaintiff alleges that Moran stood and watched as three other defendants abused him. He further avers that when he called to Moran for assistance, Moran retreated into his office and closed the door. These allegations of supervisory nonfeasance clearly are sufficient to hold Moran personally liable. *Byrd v. Brishke,* 466 F.2d 6, 11 (7th Cir. 1972).

tive Regulation 804–A(II)(C) now governs placement in control segregation. 5 Ill.Reg. 24, p. 6309–11 (June 12, 1981).

■ The complaint is silent, however, with respect to defendant DeRobertis. In his responsive brief, plaintiff plainly indicates that he seeks to hold DeRobertis liable solely on the basis of his supervisory role. Thus, to the extent that plaintiff seeks monetary damages against DeRobertis, his claims must be dismissed. *See Duncan v. Duckworth*, 644 F.2d 653, 656 (7th Cir. 1981). But the Court notes that plaintiff seeks injunctive and declaratory relief in addition to his request for damages. An award of equitable relief may be sustained under a theory of *respondeat superior. Adams v. Pate*, 445 F.2d 105, 107 n.2 (7th Cir. 1971). Therefore, the Court declines to dismiss plaintiff's claims for equitable relief against DeRobertis.

### VII. *Motion to Strike*

■ Defendants move to strike plaintiff's pleading entitled "Response to Certain Defendants' Response to Plaintiff's Motion in Opposition to Motion to Dismiss" as unauthorized by either General Rule 13(a) of the United States District Court for the Northern District of Illinois or order of this Court. It is axiomatic that parties who appear before the court *pro se* are not held strictly to the technicalities of pleading requirements. *Haines v. Kerner, supra.* Defendants do not maintain that plaintiff's filing of a sur reply has in any way resulted in prejudice to them. The Court therefore finds no material reason to grant the motion to strike. In the future, plaintiff is cautioned to respond to a motion with but a single brief.

### Conclusion

In conclusion, certain defendants' motion to dismiss is granted as to the claim of denial of access to the courts and the claim for damages against defendant DeRobertis. The motion is denied in all other respects. Certain defendants' motion to strike is denied. Defendants are given twenty days within which to file an answer to the complaint. Status is reset for January 8, 1982, at 10:00 a. m. It is so ordered.

### APPENDIX

Illinois Department of Corrections Administrative Regulation 804:

\* \* \*

L. Confinement in Control Segregation

1. Control Segregation shall be defined as the short-term confinement of residents presently assigned to the Segregation Unit, in a security environment designed for the control of residents where extreme violence, bizarre or self-destructive behavior is manifested. Only single celling will be allowed in Control Segregation.

2. The decision for the immediate placement of a resident in a Control Segregation cell may be made only by the Security Shift Supervisor, Duty Warden, Assistant Warden for Operations or Program, or the Chief Administrative Officer. In addition, prior to a resident's placement in Control Segregation, his/her case must be discussed with the institution physician to ensure that there are no medical contra-indications to placement in a Control Segregation Cell. In addition, the resident so placed must be examined by an institutional physician within 24 hours after his/her placement in a Control Segregation.

3. Under no circumstances will a resident remain in a Control Segregation cell in excess of two consecutive 72-hour periods for a single incident. At the end of the initial 72-hour period, the Duty Warden, the Assistant Warden for Program or Operations, or the Chief Administrative Officer shall review the resident's behavior exhibited while in Control Segregation and, if the decision is made to continue the resident's placement in Control Segregation for an additional 72-hour period, shall state in writing the reasons in support of such a decision. When a resident is removed from a Control cell, he/she will not be reconfined in Control Segregation for 24 hours to provide a period for acceptable behavior to be manifested.

4. The procedures of Administrative Regulation 804 relative to the preparation of a Resident Disciplinary Report, notification of the resident, and Adjustment Committee procedures are to be followed in all Control Segregation placements. The Adjustment Committee will review all actions and determine if disciplinary action is warranted.

5. Control Segregation cells may be removed and isolated from the regular Segregation Unit and/or cell fronts may be screened or partially covered so that disruption is minimized; food and vision panels must be provided.

6. Control Segregation cells should be equipped with a bed, mattress, and clean bedding (changed after a resident's release from the control cell), a wash basin with running water and a flushable toilet (water may be controlled outside of the cell to prevent flooding), and a security light of sufficient size to observe resident activities (control may be outside the cell). Heating and ventilation, one set of regular institution clothing and essential elements for personal hygiene and health should be provided. Personal property will be restricted to personal mail, legal papers and commissary items which should not pose a threat to the safety of the resident and employees.

a. Any equipment or material provided or allowed in a Control Segregation cell may be removed or restricted if the resident abuses the use of an item or if the item is considered a threat to the personal safety of the resident or employees.

7. Residents shall be provided, consistent with needs and behavior, all services, e.g., counseling, food, clothing, chaplaincy and library access, with the exception that these services will always be provided at the cell location. Control Segregation residents shall not participate in programmatic activities outside the cell. Residents in Control Segregation shall be visually checked at least every half-hour. Out-of-cell activity shall not be provided. Medical services shall be provided at or outside the cell as determined necessary by medical authority.

SELECTION COMMITTEE

A. *Membership*
   1. Three courtroom deputies
   2. Qualifications
      a. Must have been assigned to an active Judge of this court for a minimum of two years and received; on the most recent evaluation, an overall performance rating of exceeds requirements from the director of courtroom services.

B. *Chairperson*
   1. Qualification
      a. Committee member who has served as a courtroom deputy for the longest period of time.
   2. Duties
      a. Accepts applications and other materials from personnel officer for review by the committee.
      b. Coordinate scheduling of interviews.
      c. Submit written selection of the committee to the Clerk.

C. *Duties and Responsibilities*
   1. Conduct separate interviews of all eligible applicants.
   2. Select the most qualified applicants. (The number to be selected will be determined).
   3. Report the results of the selection *only* to the Clerk.

D. Orientation
   1. A meeting of the Selection Committee, Clerk and staff (Chief Deputy, Directors and Personnel Officer) regarding interview and selection techniques will be held prior to the scheduling of interviews.